So, Ms. Caraballo, whenever you are ready to proceed. Oh, and one thing I should, I'm sorry, before you do that, I should have said this at the beginning, we will be taking a brief break after the Franco case, which is coming up, probably a five-minute break. So for counsel who are after Franco, don't go away, hang in there, we'll take a brief break. And with that, counsel, you may proceed. Good morning, your honors. May it please the court, my name is Valvera Caraballo for petitioner, Serguey Hernandez Delgado. The court here has narrowed down the issues to two dispositive items, whether they had jurisdiction to hear my argument regarding his evidentiary documents or corroboration, and if he received adequate notice. In this case, the board issued a bravado affirmance and that adopted the IJ decision. They provided analysis as well, which allowed the court to review both decisions. Precedent from this court regarding Barbano states any issue raised before the immigration judges deemed to be raised to the BIA. As a corollary, excuse me, corollary of that, which would be exhaustion, Parada, Quiros Parada V. Sessions, stated that any issue raised on the merits by the BIA, even if not raised by the petitioner can be reviewed. In this case, the judge raised the issue of notice in her oral decision. She raised the issue of corroboration that I didn't specifically use the word notice in my argument. Doesn't affect it because the government still understood what I was arguing. She responded in the brief and the IJ's reasoning throughout that oral decision is based on notice and corroboration, notice and corroboration. Furthermore, the BIA also in their analysis spoke about notice and corroboration, specifically citing matter of LAC, stating that they quitted directly from the case that the judge did not need to give advance notice to petitioner in this case. Council, I'd like to ask a question on a different topic. And that is the question, if we get to the merits of the case, whether the record compels the conclusion that your client suffered past persecution. And this case, just to sort of give you a sense of my consternation, a number of different things happened to him, but none of them individually rose to the level of persecution under our case law. What is your best case for the sort of accumulation of these incidents being sufficient? I would say in the totality of the circumstances, the best case, if you could give me a second here. For his totality of the circumstance, your honor, I would say it would be Corbelina because that one specifically did not have any sort of injury. And perhaps Duran Rodriguez-Bivar, your honor. And council, I may jump in with a follow up question here. I mean, the country we're talking about here is Cuba, correct? Yes, your honor. And so we're not talking about Canada. I think, can we take into the fact that Cuba has a well-documented history of not treating people very well? I'm assuming that that kind of is an overlay of this case. We can look to the country we're talking about when we're making our decision in this case. Yes, they have more than 60 years of human rights abuses as been documented in the country conditions that were in the record. It is something that is still ongoing. So I would say those cases and in a totality of the circumstance would lead him to believe that it was one incident. And over the years, it was another incident and another incident. And it wasn't for any type of prosecutorial purpose. It was because he was a member of a political group. Well, regardless of the country though, council, let's say a person in Cuba is visited once and told, gosh, you shouldn't do this again. And that happened 11 years ago. There still has to be an individualized finding or in our case, we have to be compelled to find that whatever happened to this individual regardless of the country rose to the level of persecution. I mean, people can be persecuted in Canada and not persecuted in Cuba. So I guess what I'm struggling with here is that the incidents themselves were infrequent, although they happened several times and none of them was horrific, although they were very intimidating. So, and I just didn't see other cases that were similar to this that would give me a handle, other published cases of this court. I mean, do we apply a presumption to these cases if they're coming from designated countries? I mean, for example, do we apply a presumption that if you're coming from North Korea or Cuba or mainland China, that the standards are more stringent, if you will, than they would be if you're coming from El Salvador or Mexico? Or do we treat them all the same? Perhaps. Perhaps, I mean, that would be something that you would look at when you speak to the individual to see. I mean, as the judge stated, there are individuals that do come from these countries and nothing did happen to them. They might've told the police one time, I'm not in agreement with what you're saying with your government, but that in itself does not rise to past persecution. Perhaps it could rise to the level of well-founded fear of future persecution because they're afraid that the police is gonna retaliate against them, but especially for countries that the government is communist or very heavily socialist, meaning non-communist. And Counsel, this may be a question for opposing counsel, but I'm gonna ask it to you first. We don't get a lot of Cuba cases here in the Ninth Circuit. This might be the first one I can remember that I've had. And so do you know, is ICE or DHS, are they actually removing people to Cuba? Or is this gonna be one of these things where there's an order, but no removal? In 2019, before COVID hit, there were two removal flights to Cuba. They weren't completely full from what I'm aware of, probably about 40 to 50 individuals. But since then, I have not heard anything else. So we're not sure if he would actually be removed or if he would just be on an order of supervision with a removal order. If there's nothing else. Go ahead, we can reserve your time. And members of the audience, if you could, at our request, mask up, we would really appreciate it. We're gonna have a discussion with some folks afterwards and to have that discussion, we need everyone to be wearing a mask. So thank you. We appreciate that. Thank you. All right, and one second here, Ms. Wright, we'll get started with you. All right, Ms. Wright, you may proceed. Thank you. Can you hear me okay? Yes. Good morning. May it please the court. My name is Jocelyn Wright. I'm here on behalf of the respondent,  Let me first address your last question. What is the role of the U.S. Department of Justice Judge Owens regarding whether ICE is currently removing people to Cuba? I asked that same question. I was told that at present, they are unable to carry out removals to Cuba right now. If I could just jump in then, if that's the case, do you think, and I'll ask some follow-up questions about this, but do you think that maybe this is a case that's appropriate for mediation? Because if we're gonna make a decision in a case where it's almost, it's not advisory opinion, but it's close, because if we're gonna be litigating something that's probably never gonna happen. So I guess my first question is, is that do you know, does this petitioner have any criminal history in this country? Not that I'm aware of, Your Honor. Not in the record. Okay. So in terms of using resources, I'm just trying to make sure it makes sense that we're gonna spend a lot of time on a case that's probably not gonna, nothing's gonna happen in. Does that make sense? Yes, but I do have a couple of responses. You commented earlier that the court doesn't receive many cases from Cuba, and this is probably one of the first. The numbers are increasing, and that is because the end of the wet foot, dry foot policy. And so, I'm sorry, can you explain what that policy is, please? Oh, sure. In 2017, the Obama administration ended the wet foot, dry foot policy that went into effect in the 1990s, which was the policy that if a Cuban national made it onto the shores of the United States, landed on dry land, then they can stay, and if they're, they can apply for adjustment of status under the Cuban Adjustment Act after one year of being physically present in the United States. However, if they were interdicted in international waters before they got to dry shore, then that would be a wet foot policy, and under those circumstances, the Cuban citizen would be required to apply for asylum just as any other refugee is required to do so. In your point, Judge Baker, regarding countries like China and North Korea, all of those countries similarly are under an authoritarian regime, yet all of those citizens, non-citizens from those countries are also required to meet the statutory requirements for a refugee and asylum in the United States. Cuba, with the end of the wet foot, dry foot policy, is now in the same exact position, and so to the extent that in the past there has not been very many Cuban cases, that is not particularly germane to whether or not petitioner in this case has met his burden of demonstrating his eligibility for asylum under the statute. Let me ask you then about that. This case to me, factually, sort of seems to fall between two stools because each incident alone, only one of them involved a significant physical injury, but there were a lot of them, and they were sort of repeated problems. Are you aware of any cases that confront that situation where no one incident is persecutory, but the accumulation of non-persecutory incidents finally rises to that level? To the level of persecution? Right. I think we cited Sharma, which went through a very thorough discussion of past persecution law in the circuit, and the court in that case compared cases under both scenarios, cases that have been found to be past persecution and cases that haven't, and it went through a kind of category of categorizing the types of cases there, and so I think it's important in this case to keep in mind that, yes, there were seven detentions that formed the basis of his claim for past persecution. The seven incidents occurred sporadically over six years, sometimes with years in between. There was one that was in 2013 or 2014, and then not until 2017 that he had the second one, or the, pardon me, the third or fourth one, I believe, but in any event, if you look at those individualized, the individual incidents themselves, most of them were not really initiated by the government. It's not like the government was seeking him out specifically. A lot of them were incidents that happened during a mass protest or a mass demonstration, and he happened to be one of the attendees that the government arrested and detained, along with other peaceful protesters. Why would that matter if he, I mean, if they had randomly selected him and beaten him horribly, he would still be entitled to a finding, so I'm not sure what point there is that he was one of many in a crowd. Why is that significant? I understood, Your Honor. My point there is that the, to the extent that he's saying that he has an individualized risk. Future, okay, I see. Right. Counselor. I'm sorry. Do you want to continue? Oh, no, go ahead, Your Honor. I just wanted to circle back to Judge Owen's question about whether or not this is effectively moot. Can you explain why, at this point, removals to Cuba are not taking place? Is it because of COVID concerns the Cuban government isn't allowing the removals, or is it the Cuban government is not allowing them for other reasons, or is it that we're simply not, that is, the United States has made the decision not to execute removals to Cuba for some indeterminate period of time? What's the specific basis? The reasons behind that is not clear to me, Your Honor. I do know that- I'm sorry, I'm sorry, I'm sorry. The reasons behind, there are multiple possibilities, right? So the Cuban government may be saying no. Maybe it's our government saying no. Who is saying no, and what reasons have been articulated why? I don't know, Your Honor. I can ask DHS for more clarification. I do know that perhaps if there are travel documents that are being refused to be issued by the Cuban government, that could be a basis. You're not even sure why they're not being removed? Can you tell me, is it the source of the problem, if you will, of the Cuban government, or is it our problem, excuse me, our government or the Cuban government? And again, I don't know. You don't know. Because the Justice Department doesn't, is not, we're not privy to enforcement. That's solely a DHS function. I can ask DHS and get back to the court, of course, with an answer. I'd like to circle back to something that Judge Owens asked you earlier. In my experience, we have often decided these cases even when the person is not removed, sometimes for a period of many years after our decision. It's very sort of frustrating that that happens, but it does happen. And Judge Owens asked you if this case would be appropriate for mediation to determine whether there is some common ground. Is that something the government would be willing to entertain? The government is always open to mediation. I do have to point out in this case, however, that in response, after I filed the brief in this case, the next day the court issued the order saying this case is ready to be submitted to a panel. And so if you guys, the parties, have any options for alternative resolution, now's the time to tell the court. And in response to that, the party, Petitioner's Council and I agreed to stay the, to stay submission to a referral to the panel so that Petitioner could seek prosecutorial discretion from the Department of Homeland Security. It's my understanding that he did so. I don't know what the outcome of that was, but there was no further motion to stay, to continue to stay the proceedings, or any basis for continuing to hold the proceedings in abeyance that Petitioner made in this case. Right now, the enforcement priorities memo is vacated by the Southern District of Texas. The Supreme Court is going to hear that case in December, if my understanding is correct. Petitioner in this case really isn't eligible for any other type of relief. He doesn't have the requisite eligibility requirements for cancellation of removal, adjustment of status. Again, Cuban Adjustment Act adjustment of status is not available to him because he has never been admitted or paroled into the United States. So under the USCIS's announcement in February of 2022, he would not be eligible to have his, any type of Cuban Adjustment Act application reconsidered, even if he made one previously. And so, while yes, the government of course would not, would be, would welcome mediation if the court decides that it would be appropriate, I would like the court to keep those concerns in mind as well from the government's point of view. All right, thank you, counsel. Thank you. Ms. Caraballo, if you could address the, what your opposing counsel just mentioned about the idea that we would stay the proceedings. Can you give us an update if you've had any luck with DHS? No, since he, it's a very long story, but there was counsel in Florida who submitted to the district court. I have personally had success with USCIS granting based on parole from former Alamon bonds. However, his was submitted, there has been no answer. It's been more than a year at this point. Local DHS refused to terminate because he didn't have any other form of relief and they didn't want to issue I suppose in order of supervision in that case. So, this is basically his only option if USCIS were to say that, yes, he's an arriving alien, but know that Alamon bonds does not count as a parole. Do you think mediation- Alamon bond. Do you think mediation would be helpful in this case? I had asked her if she would agree, but I was met with a no because she did not believe that the harm he suffered in a totality rose to any level that he should be granted asylum. Well, I think opposing counsel just said that she would be open to mediation and she put some reservations on that, which she made very clear. But, I mean, I'll just put it this way. Would you rather we decide the case as it is now or would you rather have a chance to talk this over with the government and the mediator? What would you choose? Oh, I can talk it over with the government and the mediator. I'm not saying that's what we're going to do. I just want to make sure I understand from you, if those are your two choices, which choices you would take. So, you would rather mediation over us issuing a decision at this time? Honestly, I would rather a decision. He's been waiting several years already. Fair enough. No, no, I understand. That's why it differs in every case. Okay, fair enough. Anything you want to add or any questions from my colleagues up here? And just briefly to answer Judge Baker's question about why removals aren't happening. It's back to the Mariel Boatlift. So, Cuba's not accepting individuals back. You mean since the Mariel Boatlift? That's 40 years ago. Yes, yes. Might be 40. There's still a list. Might be 42 years ago. More than 40. Well, yes. Yes, that's exactly right. It was 42 years to be precise. Good memory, Judge Owens. Fans of the movie Scarface will remember the dates well. Unless we have any other questions? All right, thank you both. A very interesting case. Thank you both for your briefing and argument. We'll call the next.
judges: GRABER, OWENS, Baker